**PEPSICO, INC., Plaintiff,**

v.

**THE COCA–COLA COMPANY, Defendant.**

No. 98Civ.3282(LAP).

United States District Court, S.D. New York.

Sept. 19, 2000.

Kaye, Scholer, Fierman, Hays & Handler, LLP, New York, NY (Randolph S. Sherman, Richard M. Steuer, of counsel), Jones, Day, Reavis & Pogue, Cleveland, OH (Thomas F. Cullen, Jr., Robert H. Rawson, Jr., of counsel), Richard C. Weisberg, Merion, PA, Gerard W. Casey, PepsiCo, Inc., Purchase, NY, for Plaintiff PepsiCo, Inc.

Akin, Gump, Strauss, Hauer & Feld, L.L.P., New York, NY (Jonathan M. Ja-

cobson, Robert Johnson, Daniel McInnis, of counsel), W. Dixon Shay III, Jonathan Gottlieb, King & Spalding, Atlanta, GA (Michael C. Russ, Jeffrey S. Cashdan, of counsel), Joel M. Neuman, Marshall B. Dukes, the Coca–Cola Company, Atlanta, GA, for Defendant the Coca–Cola Company.

## OPINION

PRESKA, District Judge.

In 1986, PepsiCo's then-President and CEO, Roger Enrico, made the following observation in his book, *The Other Guy Blinked: How Pepsi Won The Cola Wars:*

> By comparison [to the major battles of history], of course, the battles that Pepsi–Cola and Coke fight in the Cola Wars are trivial. There are no final defeats. The ammunition we fire at one another is often damn silly stuff. But for all that, our battles are very real.

> Tens of billions of dollars are at stake. And "market share"—the sales performance of a soft drink compared to others in its category. And something intangible, but no less important: pride. That last reason is, in this story, perhaps the most important ingredient.[1]

Whatever may be the "most important ingredient" in making cola and whatever may be the "most important ingredient" in the Cola Wars, the most important ingredient in opposing summary judgment is "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). By this measure, PepsiCo's brew falls flat.

Plaintiff PepsiCo, Inc. ("PepsiCo") brought this action against defendant The Coca–Cola Company ("Coca–Cola") for monopolization and attempted monopolization of the market for fountain-dispensed soft drinks distributed through independent foodservice distributors throughout the United States in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Coca–Cola's motion to dismiss the complaint was denied. PepsiCo later amended the complaint to add a claim under section 1 of the Sherman Act, 15 U.S.C. § 1, alleging that Coca–Cola entered into various agreements with individual foodservice distributors amounting to concerted action in restraint of trade. Coca–Cola now moves for summary judgment on all claims pursuant to Fed.R.Civ.P. 56. For the reasons that follow, Coca–Cola's motion is granted.

## BACKGROUND

Restaurant chains, movie theater chains and other foodservice outlets purchase fountain soda syrup through intermediaries who, in turn, have supply agreements with the syrup manufacturers. These intermediaries include distributors and bottlers. Certain distributors, so-called "independent foodservice distributors," provide "one-stop shopping," which allows the customer to obtain all necessary supplies from one distributor at each of the customer's locations. (*See* Adzia Decl. ¶ 11.) The type of distribution provided by independent foodservice distributors is referred to as "systems distribution," and these independent foodservice distributors are sometimes referred to as systems distributors. Bottlers provide fountain syrup and beverages to customers but do not provide the "one-stop shopping" characteristic of foodservice distributors. (*See* Wilson Dep. Tr. Ex. 12 at CCND2034082.)

Independent foodservice distributors receive fountain syrup products pursuant to agreements with the particular fountain syrup manufacturer. Coca–Cola's agreements contain a so-called "loyalty" or "conflict of interest" policy, which provides that distributors who supply customers with Coca–Cola may not "handle[ ] the soft drink products of [PepsiCo]." (Pl.'s Opp. App. Ex. 55 (CCND2015918).) Foodservice distributors who breach the loyalty policy risk termination by Coca–Cola. (*See, e.g.,* Gaffney Dep. Tr. Ex. 41 at CCND2012038; Wilson Dep. Tr. at 431–33.) Thus, a dis-

---

1. Roger Enrico and Jesse Kornbluth, *The Other Guy Blinked; How Pepsi Won The Cola Wars 2–3* (1986). Mr. Enrico remains CEO of PepsiCo.

tributor subject to the loyalty policy can supply all its customers with either Pepsi or Coke, not both. (Kaiser Dep. Tr. at 98) ("[Y]ou either live in a red world [Coke] or a blue world [Pepsi].... You can't live in both worlds.") Because distributors are given an all or nothing choice, a customer of a distributor subject to Coca–Cola's loyalty policy who wants Pepsi will have to go elsewhere to get it.

PepsiCo defined the relevant customer base in the amended complaint as "restaurant chains, movie theater chains and other 'on-premise' accounts across America." (Am.Compl.¶ 7.) PepsiCo appears to have narrowed its customer definition in its submission on this motion to large restaurant chain accounts that are not "heavily franchised" with low fountain "volume per outlet." (Pl.'s 56.1 Counterstmt. ¶¶ 30–31, 33, 36(a), (c).)

PepsiCo's amended complaint defines the relevant market pertinent to the instant antitrust inquiry as "the market for fountain-dispensed soft drinks distributed through independent food service distributors throughout the United States." (Am. Compl.¶ 6.) The affidavits and exhibits show that customers have a preference for receiving fountain syrup through independent foodservice distributors because of the various one-stop shopping advantages. For example, customers who receive most or all of their supplies from a single source can minimize back-door deliveries to each outlet, which in turn minimizes business interruption. In addition, independent foodservice distributors can provide consolidated invoicing and minimized distribution costs.

Coca–Cola has been distributing fountain syrup through independent foodservice distributors for many years. PepsiCo traditionally distributed its fountain syrup through bottlers but, in the late 1990s, decided to change that distribution method to utilize independent foodservice distributors. However, Coca–Cola began to enforce its loyalty policy. Thus, PepsiCo was essentially prohibited from distributing its syrup via then-existing systems distribu-

tion. PepsiCo contends that Coca–Cola's enforcement of the loyalty policy amounts to unlawful monopolization and attempted monopolization.

Coca–Cola argues that PepsiCo has improperly defined the relevant product market. Specifically, Coca–Cola asserts that the relevant market cannot be limited to fountain drinks "distributed through independent foodservice distributors." According to Coca–Cola, customers of independent foodservice distributors can obtain fountain drinks through other acceptable substitutes, such as bottlers.

Coca–Cola also argues that there is no evidence that Coca–Cola has monopoly power or any dangerous probability of achieving it and that Coca–Cola's conduct has not caused PepsiCo any injury.

Last, Coca–Cola contends that its distributor agreements do not restrain trade unreasonably and do not demonstrate a *per se* unlawful horizontal conspiracy among the foodservice distributors.

## ANALYSIS

### I. Legal Standard.

"A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36 (2d Cir.1994); *see* Fed.R.Civ.P. 56(c); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome of the particular litigation if the substantive law at issue so renders them. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The burden of establishing that no genuine factual dispute exists rests on the party seeking summary judgment. *Chambers*, 43 F.3d at 36. Of particular relevance here is the Supreme Court's reiteration in *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548, that "the burden on the moving party may be discharged by 'showing'— that is pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial," however, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."); *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223–24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The moving party, in other words, does not bear the burden of disproving an essential element of the nonmoving party's claim.

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir.1994). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Instead, the nonmovant must " 'come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely ... on the basis of conjecture or surmise.' " *Trans Sport v. Starter Sportswear*, 964 F.2d 186, 188 (2d Cir.1992) (citation omitted).

In assessing materials such as affidavits, exhibits, interrogatory answers, and depositions to determine whether the moving party has satisfied its burden, the court must view the record "in the light most favorable to the party opposing the motion" by resolving "all ambiguities and draw[ing] all factual inferences in favor of the party against whom summary judgment is sought." *Chambers*, 43 F.3d at 36. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a *reasonable* inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Id.* at 37 (emphasis added).

## II. Section 2 of the Sherman Act.

PepsiCo alleges that Coca–Cola has monopolized or attempted to monopolize the relevant market in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. To state a monopolization claim under section 2, a plaintiff must establish "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 61 (2d Cir.1997). To state an attempted monopolization claim, a plaintiff must establish, "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 890, 122 L.Ed.2d 247 (1993); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99–100 (2d Cir.1998).

### A. The Relevant Market.

In denying Coca–Cola's motion to dismiss the complaint, I warned that "PepsiCo now must demonstrate, ..., that 'market realities' support the market it has alleged." *PepsiCo, Inc. v. Coca–Cola Co.*, No. 98 Civ. 3282, 1998 WL 547088, at*18 (S.D.N.Y. Aug. 27, 1998) ("*Pepsi I*"). Un-

fortunately for PepsiCo, it has not met its burden. Indeed, market realities, evidenced by the voluminous submissions on the instant motion,[2] demonstrate a far broader relevant market than that identified in the Amended Complaint.

■ A relevant product market consists of "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E.I. duPont de Nemours & Co.* 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956). Products have reasonable interchangeability if consumers treat them as "acceptable substitutes." *See Federal Trade Comm'n v. Cardinal Health, Inc.,* 12 F.Supp.2d 34, 45 (D.D.C.1998) ("the relevant market consists of all of the products that the Defendants' customers view as substitutes to those supplied by the Defendants"). In order to evaluate whether one product would be an acceptable substitute for another, courts consider whether there exists cross-elasticity of demand and supply of the two products. *See AD/SAT, Div. of Skylight, Inc. v. Associated Press,* 181 F.3d 216, 227 (2d Cir.1999). "Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product." *Id.* Likewise, cross-elasticity of supply exists if producers of a particular product would shift to production of another product in response to a supplier's charging supracompetitive[3] prices for that other product. *See id.*

■ In PepsiCo's view, fountain syrup delivered by independent foodservice distributors is the relevant market because it has no acceptable substitutes. Coca–Cola contends that the mode of delivery does not define the relevant market for fountain syrup because customers of independent foodservice distributors view other modes of delivery, e.g., bottler delivery, as acceptable substitutes. As discussed below, Coca–Cola has pointed out the dearth of evidence supporting PepsiCo's relevant market definition, and PepsiCo has failed to come forward with evidence to show that there is a genuine issue of fact to warrant trial.

As a preliminary matter, it is important to identify the customer base in order to evaluate the perspective of substitution and determine the relevant market. This is so because the market (or product) definition may be narrowed by the type of consumer. For example, in *Belfiore v. New York Times Co.,* 654 F.Supp. 842, 846 (D.Conn.1986), *aff'd,* 826 F.2d 177 (2d Cir. 1987), the plaintiff attempted (albeit unsuccessfully) to define a market as " 'general interest daily newspapers directed primarily to upscale readers.' " 'Upscale' readers were those readers who met certain financial and occupational criteria. Similarly, in *AD/SAT, Div. of Skylight Inc. v. Associated Press,* 920 F.Supp. 1287, 1298 (S.D.N.Y. 1996), *aff'd,* 181, F.3d 216, 227 (2d Cir. 1999), the plaintiff failed in its attempt to define a market as "rush" electronic delivery of advertisements because it could not "identify any class of advertisers [i.e., customers] which consistently depend upon the availability of rush services which only electronic deliverers can provide...." These cases illustrate that while, as a matter of law, the market may be narrowed by consumer definition, on a motion for summary judgment, the party attempting to so narrow the market must set forth evidence from which a factfinder could find a sepa-

---

**2.** Somehow the Supreme Court's language in *Celotex* leads one to envision the initial "pointing out" an absence of evidence as a single page or other short submission. I note with some wonderment that the initial "pointing out" papers on this motion filled at least two boxes.

**3.** "A supracompetitive price is a price greater than the firm could charge if it had to com-

pete for customers against other manufacturers with similar production costs." J. Neil Lombardo, Note, *Resuscitating Monopoly Leveraging: Strategic Business Behavior and Its Implications for the Proper Treatment of Unilateral Anticompetitive Conduct under Federal Antitrust Laws,* 41 St. Louis U. L.J. 387, 452 n. 17 (1996).

rate market for a product *used by specific consumers.* Indeed, PepsiCo in effect urges that a bundle of product (fountain syrup) and services (system distribution) utilized by certain customers comprises a separate market.

On this motion, PepsiCo defines that customer base as those who share certain "objective characteristics" based on their ability to "appreciat[e] and internaliz[e] the benefits of receiving fountain syrup through systems distributors." (Pl.'s 56.1 Counterstmt. ¶ 30.) According to Pepsi-Co, the following characteristics define such a customer: (1) size: "large chain accounts (usually restaurants)" that purchase an annual volume of product "sufficiently large to permit economies of scale in procurement, warehousing, and transportation" and with a "large enough number of outlets to permit efficient planning of delivery routes and schedules", (*id.* ¶¶ 30, 31, 35); (2) predictable needs: limited and consistent menus, (*id.* ¶ 32); (3) centralized management: fountain purchase decisions are made in a uniform manner across a national or regional system; (4) limited franchising: systems distribution is not "meaningful" to "heavily franchised" chains as opposed to chains with large groups of "corporately owned stores", (*id.* ¶ 34); (5) service of fountain soda complements: meals are served with fountain drinks but soft drinks in bottles and cans are not, (*id.* ¶ 36(a), (b)); and (6) low volume per outlet: system-wide volume is high but each individual outlet only requires a few cases of fountain syrup per delivery, (*id.* ¶ 36(c)). In contrast, the Amended Complaint repeatedly refers to fountain syrup customers broadly, as "restaurant chains, movie theater chains and other 'on-premise' accounts." (*See* Am. Compl. ¶¶ 7, 8, 11, 14, 29, 31, 33.) Although not dispositive, I reject PepsiCo's assertion that the customer definition set forth in its submission on the instant motion does not differ from that set forth in the Amended Complaint. Clearly, the customers described in the Amended Complaint are not so circumscribed as those in the six-factor description noted above that

PepsiCo states is based on those particular customers' ability to "appreciat[e] and internaliz[e] the benefits of receiving fountain syrup through systems distribution." (Pl.'s 56.1 Counterstmt. ¶ 30.) For example, PepsiCo now excludes franchisees and all convenience stores from its customer base, but includes company-owned restaurant outlets.

In any event, however, PepsiCo's customer definition on this motion begs the question. As PepsiCo counsel conceded at oral argument, "We limit the definition to this group because ... this is the group where Coke has, because it excludes competition, market power." (*See* Tr. dated Aug. 3, 2000 at 28.) Market power is determined *after* defining the relevant market, including the customer base, not before. "Obviously, the narrower the market defined by plaintiffs, the easier it is to show possession of monopoly power in the relevant market." *Belfiore,* 654 F.Supp. at 846. PepsiCo has chosen to define the elements of the relevant market to suit its desire for high Coca–Cola market share, rather than letting the market define itself. (*See, e.g.,* Pl.'s 56.1 Response ¶ 129 (excluding Dickenson Theatres, Act III Theatres and Busch Gardens from consideration "because such accounts do not possess the attributes typical of the customers at issue in this suit").) Regardless of the substance of the proffered customer definition or the method by which it was arrived at, PepsiCo has not proffered sufficient evidence from which a factfinder could conclude that the customer base should be viewed so narrowly. Accordingly, I reject its latest definition insofar as it creates a "strange red-haired, bearded, one-eyed man-with-a-limp classification." *United States v. Grinnell,* 384 U.S. 563, 590–91, 86 S.Ct. 1698, 1714, 16 L.Ed.2d 778 (Fortas, J., dissenting); *see Belfiore,* 654 F.Supp. at 846.

The evidence does not support a finding that the product and services bundle urged by PepsiCo comprises a separate market, either. The submissions show that, while

customers view fountain syrup delivered through independent foodservice distributors as preferential and advantageous, they view fountain syrup delivered through other means as acceptable. Indeed, the customers view the delivery method of the fountain syrup as only one of many criteria in the selection of a fountain syrup supplier. Despite one-stop shopping's advantageous features, the evidence does not show that the preference for independent foodservice distributors is so strong so as to eliminate delivery through other means as an acceptable alternative. *Cf. Global Discount Travel Servs. v. Trans World Airlines,* 960 F.Supp. 701, 705 (S.D.N.Y.1997) (Sotomayor, J.) (complaint dismissed where all airline tickets between city pairs deliver passengers to and from desired locations because preference to fly one airline over another does not create separate market). Thus, here, the mere preference for one form of delivery over another does not create separate markets for the same product delivered one way as opposed to another.

As Coca–Cola points out, of the 67 customers whose depositions were taken or who provided declarations in this case, not one said that delivery method was the determinative factor in selecting a fountain syrup supplier. (Def.'s 56.1 Stmt. ¶¶ 111–18.) While PepsiCo counters that those same customers identified the benefits of delivery through independent foodservice distributors such as "fewer invoices to process, fewer orders to make, fewer disruptions to the customer, reduced opportunities for theft and an increased ability to achieve consistency and control of products entering the customer's outlets," (Pl.'s 56.1 Response ¶ 111), and stated that bottlers would have to provide other advantages in order to get these customers to switch to bottler delivery, as a matter of law, that evidence is insufficient to warrant a finding of a separate product market. Pepsi, in fact, concedes that distribution is only one of *"a number of important factors"* considered in selecting a fountain syrup supplier. (*Id.* ¶ 114) (emphasis added).

The facts of *Thurman Indus. v. Pay 'N Pak Stores,* 875 F.2d 1369 (9th Cir.1989), are somewhat analogous to those presented here. In *Thurman,* Thurman and Pay 'N Pak were retail chains operating "home center" stores offering a variety of tools, supplies and other products for home improvement. *Id.* at 1372. Thurman accused Pay 'N Pak of (1) pressuring product suppliers and dealers to refuse to deal with Thurman, (2) predatorily pricing certain home improvement items, and (3) knowingly obtaining preferential pricing and other terms from various dealers and suppliers. *Id.* Thurman defined the relevant market as home center stores only, arguing that the broad selection of home improvement supplies and trained sales staff offered by home center stores constituted a clustering or grouping of goods and services that was essentially one product for which there were no acceptable substitutes. Pay 'N Pak disagreed, contending that any retail establishment offering the same particular type of goods as the home center store, whether or not the retail establishment offered the full range of goods and services available at home center stores, should be included. In particular, Pay 'N Pak contended that "Thurman offered insufficient evidence to support market isolation of home center stores from other retail establishments selling identical or similar products but with less comprehensive product sizes and selections." *Id.* at 1373. The court of appeals agreed with Pay 'N Pak. Assuming Thurman's factual contentions to be true "(1) that home centers are perceived as distinguishable from other stores by the variety of products and the trained sales staff that home centers offer, and (2) that customers engaged in major home remodeling or home repair projects patronize home centers because of this distinction," the court held that Thurman's contentions did not support a finding that other stores selling house paint, for example, could not through *"price reductions or other marketing strategies* lure significant numbers of do-it-yourself builders in to buying paint at

a specialty store even if they purchase all their other supplies at a home center." *Id.* at 1376 (emphasis added).

By the same token, even if I were to accept as true PepsiCo's factual assertions that (1) customers regard the one-stop shopping method of distribution as the most important factor in deciding from whom to purchase fountain syrup, (2) independent foodservice distributors are distinguishable because of the variety of products and other conveniences they offer and (3) customers patronize independent foodservice distributors because of the variety and convenience, PepsiCo has come forth with insufficient evidence to show that bottlers are unable through price reductions or other marketing strategies to lure significant numbers of customers into buying fountain syrup from bottlers. (*See* Walsh Dep. Tr. at 312) ("bottlers have won accounts who value marketing and service, hypothetically, over the one-stop shopping"); *id.* at 96 ("A bottler may choose to offer local service to win a pour rights [sic] at a certain customer").

More important, though, is the reasonableness of the alternative method of distribution in the eyes of the customer. Thus, the various customers' views that "bottler delivery would have been or, in the future would be, a viable alternative *only if Pepsi compensated them for having to use a less efficient/more costly means of delivery,*" (Pl.'s 56.1 Response ¶ 111 (emphasis in original)), does not vitiate the idea that bottler delivery can be an acceptable alternative. Indeed, the idea that "price reductions or other marketing strategies" can be used to lure customers from one method of delivery to another is consistent with the notion that the product, and not the method of delivery of the product, defines the relevant market. *See Thurman*, 875 F.2d at 1376. Indeed, the substantial majority of customers PepsiCo cites in support of its argument testified to just that fact—if bottlers offer certain advantages, independent foodservice distributor customers would consider switching. (*See* Pl.'s 56.1 Response ¶ 111.) Customers testified that they would switch to

bottlers if they were paid additional monies, (*see* Barasso Dep. Tr. at 89–90), or received the same or better value, (*see* Wexler Dep. Tr. at 25–26), and indeed, certain customers have switched on those bases, (*see, e.g.,* Def.'s 56.1 Stmt. ¶ 135 (customer eventually switched to Pepsi bottler delivery "because of marketing allowances offered by the local Pepsi bottler"); ¶ 136 (customer switched to Coca–Cola bottler delivery and bottler provides "frequent delivery service, shelf stocking and stock rotation and strong local marketing tieins")). Indeed, one customer testified that the factors he considered in making a decision as to which fountain syrup to use were "service, distribution, marketing and price." (Miller Dep. Tr. at 44). With respect to the distribution factor, that customer testified that delivery through foodservice distributors was a "distinct advantage" over bottler delivery, but still, *distribution was only one of four factors considered.* Furthermore, at least three of the customers discussed receive Pepsi through bottlers and the remainder of their supplies through independent foodservice distributors, even though they have a preference for receiving fountain syrup from the independent foodservice distributors. (*See* Pl.'s 56.1 Response ¶ 129.) Most compelling, *no customer* testified that Coca–Cola's loyalty policy prevented the customer from obtaining Pepsi.

In order to define the relevant market, courts should be guided by the commercial realities facing the fountain syrup consumer, not only by the method of product distribution. *See Westman Comm'n Co. v. Hobart Int'l,* 796 F.2d 1216, 1220–21 (10th Cir.1986) ("The fact that a distributor is able to satisfy all of a customer's needs at one location does not mean that it is free from competition from other types of distributors."). In order to find that a "cluster" of goods or services defines the relevant market, the evidence must show that the particular cluster or package of goods is the "object of consumer demand." *Id.* at 1221. PepsiCo has not come forth with sufficient evidence from which a factfinder

could conclude that the one-stop shopping advantage provided by independent foodservice distributors is the object of demand rather than the fountain syrup itself. As noted above, customers testified that distribution was only one of many factors evaluated when deciding on a fountain syrup vendor, not the decisive criterion. (*See* Fix Dep. Tr. Ex. 3 at ESCAPE 0000038–39 (identifying distribution as one of eight points evaluated by customer bearing on its decision to sign agreement with Coca–Cola).) Furthermore, while some customers stated that distribution was an important, or in some cases, significant factor, none stated that it was the most important factor in determining the source of fountain syrup. (*See* Def.'s 56.1 Stmt. ¶ 111; Pl.'s 56.1 Response ¶ 111.) Thus, whether a fountain syrup supplier can provide one-stop shopping is not determinative of a customer's decision to use that supplier or to purchase a particular brand of syrup. The fact that certain customers switched to bottler-delivered Pepsi after receiving additional compensation does not mean that bottler-delivered Pepsi is not an acceptable substitute. *See Westman Comm'n,* 796 F.2d at 1221 (absence of acceptable substitutes at comparable prices does not vitiate finding that acceptable substitutes exist). And, PepsiCo's admission that certain customers who switched to bottler-delivered Pepsi, albeit "unwillingly," did not receive additional compensation, only supports Coca–Cola's definition of the relevant market. (Pl.'s 56.1 Response ¶ 112.) Clearly, the method of distribution was not as important to those customers as the type of fountain syrup—they were willing to forgo one-stop shopping in order to continue receiving the fountain syrup of their choice, *viz.,* Pepsi. Whether or not a customer would have chosen bottler delivery of Pepsi given a *choice* between bottler and distributor delivery is irrelevant to the determination that an equivalent product can be obtained through other means.

In addition to the customer testimony, Coca–Cola relies on a customer survey conducted on PepsiCo's behalf in connection with its fountain syrup line of business. The survey asked ninety-nine PepsiCo customers to identify the basic requirements of a fountain syrup supplier. No customer cited delivery by independent foodservice distributors. Next, the survey listed thirty-eight criteria relevant to supplier selection, and respondents were asked to rank them by importance. Availability of independent foodservice distributor delivery was ranked thirty-five out of the thirty-eight criteria. The respondents were also asked to name their fountain syrup supplier criteria. None mentioned independent foodservice delivery. PepsiCo counters by stating that the responses show that the criteria selected are consistent with delivery by independent foodservice distributors. (*See* Pl.'s 56.1 Response ¶ 124 ("they did mention attributes of delivery performance that are descriptive of systems distribution").) Those attributes include "'delivery reliability, dependability, convenience' and distribution in nationwide, uninterrupted, having product in stock." (Allen Dep. Tr. at 457–58.) I find the mere mention of those attributes insufficient to show that systems distribution was of such importance to those customers surveyed that a factfinder could conclude that that "cluster" of goods and services constitutes a separate market. Furthermore, there is no evidence that other forms of delivery cannot meet some, if not all, of these desired criteria.

The factors enumerated in *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962), also dictate that fountain syrup distributed by independent foodservice distributors does not constitute a separate market. In *Brown Shoe,* the Supreme Court identified the following "practical indicia" as useful in determining whether a separate market or submarket exists: (1) industry or public recognition of the submarket as a separate economic entity, (2) the product's peculiar characteristics and uses, (3) unique production facilities, (4) distinct customers, (5)

sensitivity to price changes and (6) specialized vendors. 370 U.S. at 325, 82 S.Ct. at 1524.

### 1. Lack of Industry Recognition

On the evidence submitted on the instant motion, a factfinder could not conclude that Coca–Cola or PepsiCo, or fountain syrup manufacturers in general, identify different delivery methods of fountain syrup as separate markets. Indeed, the president and CEO of Pepsi-Cola North America from 1995 through 1998 conceded that, "never ever would I think of or refer to a delivery method as a market." (B. Barnes Dep. Tr. at 231.) The testimony relied on by PepsiCo to avoid the effect of this concession is of no such effect:

> In the restaurant world fountain segment, whatever you want to call it, the only people that decide what product to serve is the restaurant.... When I say [delivery method] is not a market, you call on the market that makes the decision.... In this case the restaurant company decides what they are going to sell. And to me that is how I think of a market.

(*Id.* at 436–37.) Thus, PepsiCo's own officer testified that the relevant market is fountain syrup irrespective of delivery method.

In addition, PepsiCo admits that the "relevant competition is between Pepsi and Coke, and the method by which fountain would be delivered by Pepsi and Coke is a consideration—often an important consideration—to the typical systems distributor customer." (Pl.'s 56.1 Response ¶ 133.) Furthermore, there is no support for the proposition that (1) Coca–Cola's recognition that one-stop shopping provides a competitive advantage and (2) PepsiCo's

mirror recognition that Coca–Cola's enforcement of its loyalty policy puts Pepsi-Co at a competitive disadvantage are equivalent to a recognition of a separate market. (*See* Pl.'s 56.1 Response ¶¶ 143, 144; Pl.'s 56.1 Counterstmt. ¶ 98.) "Fountain syrup distributed by independent foodservice distributors" is not a "product line" recognized by the public, customers or the industry as separate from "fountain syrup distributed through other means." *Cf. Brown Shoe*, 370 U.S. at 326, 82 S.Ct. at 1524 (men's, women's and children's shoes were separate product lines recognized by public); *General Foods Corp. v. Federal Trade Comm'n*, 386 F.2d 936 at 941 (3d Cir.1967) (market limited to household steel wool, not non-steel wool household aids, where household steel wool producers looked to one another in setting prices and reaching marketing decisions and regarded their only serious competition as steel wool producers); *Beatrice Foods Co. v. Federal Trade Comm'n*, 540 F.2d 303, 308 (7th Cir.1976) (aerosols and spray products are a separate product market from paint brushes and rollers where "aerosol manufacturers regard themselves as a separate industry").[4]

Furthermore, PepsiCo's argument that it has recognized distribution through independent foodservice distributors as a separate market is unsupported by the evidence. PepsiCo's "Voice of the Customer" Survey, conducted by an outside consulting firm, analyzed the needs of the fountain customer and determined that delivery through foodservice distributors was "important," (Pl.'s 56.1 Counterstmt. ¶ 85), and that "the biggest single disadvantage of [bottler delivery] when compared with [commissary delivery] was that it didn't provide the restaurant operator with a single shipment," (Allen Dep. Tr.

---

**4.** The evaluation of the market should focus on manufacturer and consumer recognition of the relevant competition (here, the fountain syrup manufacturers), not on delivery provider recognition of the competition. PepsiCo, however, looks to what it characterizes as distributors' recognition. (*See, e.g.,* Pl.'s 56.1 Counterstmt. ¶ 53 ("The executives of the

leading systems firms have testified that their competition is other systems distributors.").) The fact that independent foodservice distributors view their primary competition as one another, and not bottlers, is not pertinent to industry recognition of the relevant market within the meaning of *Brown Shoe.*

at 144). The consulting firm concluded that "fountain distribution" constitutes "Not One Fountain Business, But Two." (*Id.* Ex. 55.) However, in addition to issues relating to fountain distribution, the consulting firm addressed customer needs relating to many facets of the fountain industry. (*See id.*) PepsiCo ultimately developed a dedicated Fountain Beverage Division. (*See* Pl.'s 56.1 Counterstmt. ¶ 95.) The events leading up to the formation of the Fountain Beverage Division are insufficient to permit a factfinder to conclude that PepsiCo recognized a submarket. Indeed, while the Fountain Beverage Division may have embarked on projects to revamp PepsiCo's fountain beverage business, there is no evidence suggesting that the PepsiCo Fountain Beverage Division limited its contacts to independent foodservice distributors and did not interface with bottlers. (*See* Pl.'s 56.1 Counterstmt. ¶ 93–95.) Thus, PepsiCo has pointed to no evidence to suggest a separate industry recognition for fountain syrup based on delivery method. Contrary to PepsiCo's contention, I do not find that the documents and testimony submitted could be construed to evidence industry recognition of a separate market in the manner of *Federal Trade Comm'n v. Cardinal Health, Inc.*, 12 F.Supp.2d 34, 49 & n. 10 (D.D.C.1998) (finding submarket of drug wholesalers where defendants' documents showed that they "clearly viewed their economic competition to be from their fellow drug wholesalers, and not from the other sources as suggested by the [d]efendants at trial"). Indeed, the evidence shows that Coca–Cola viewed PepsiCo as a competitor, and *vice versa,* and that both they and fountain syrup purchasers viewed systems distribution as a competitive advantage, not a separate market.

### 2. *Product Characteristics and Uses*

PepsiCo does not dispute that fountain syrup delivered by an independent foodservice distributor is no different from fountain syrup delivered by another means of distribution. (*See* Pl.'s 56.1 Response ¶ 145.) PepsiCo argues however that this comparison is irrelevant because the relevant product is "the consolidated delivery of the fountain syrup used to form the drink along with other products through system distribution," (*id.*), and that this bundle of product and services is itself a unique product. PepsiCo's application of this *Brown Shoe* factor, once again, begs the question. Courts following *Brown Shoe* have determined that a product has peculiar characteristics where the tangible product has visible differences or applications. *See, e.g., Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524 (men's, women's and children's shoes each have peculiar characteristics); *General Foods*, 386 F.2d at 941 (nonsteel wool products bear little resemblance to steel wool, are not functionally similar and "their compositions range from plastic, to copper, to abrasive-surface sponges"); *Beatrice Foods*, 540 F.2d at 307 (aerosols "are used for specialized painting applications for which the use of a paint brush or roller would be impractical" "); *Ansell Inc. v. Schmid Laboratories, Inc.*, 757 F.Supp. 467, 472–73 (D.N.J.) (condoms differed in brand name, shape, size and package design and volume), *aff'd,* 941 F.2d 1200 (3d Cir.1991). In the cases where the court has identified the method of sale as a peculiar characteristic, the method of sale has been the business of the defendant itself. For example, in *Federal Trade Comm'n v. Staples, Inc.*, 970 F.Supp. 1066, 1074–75 (D.D.C.1997), the Court determined that office superstores constituted a market distinct from other sellers of office supplies. The product that Staples created, however, was the superstore itself—a place where customers could purchase a wide variety of consumable office supplies—not just a few isolated consumable office supplies. *See also Bon–Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F.Supp. 860, 874 (W.D.N.Y.1994) (recognizing department stores as product distinct from general merchandise, apparel and furniture stores). Similarly, in *Cardinal Health*, the Court determined that drug wholesalers comprised a market sep-

arate from other distributors of prescription pharmaceuticals. The defendants in *Cardinal Health* "describe[d] *themselves* as 'middlemen' who take delivery of pharmaceutical products in bulk from manufacturers, warehouse the products, and then deliver them to various dispensers." 12 F.Supp.2d at 47 (emphasis added). Thus, the product that the *defendants* provided was the wholesaling and delivery of the merchandise. The Court determined that this wholesaling and delivering of drugs was a distinct product providing "an efficient way to obtain prescription drugs through centralized warehousing, delivery, and billing services that enable the customers to avoid carrying large inventories, dealing with a large number of vendors, and negotiating numerous transactions." *Id.* at 47.

In *Henry v. Chloride, Inc.,* 809 F.2d 1334, 1343 (8th Cir.1987), the Court did not make a specific finding on special uses or characteristics of the product; nevertheless, the Court found the relevant market to be "route sales of replacement batteries." However, it is worth noting that the plaintiff in *Henry* was the trustee for a battery distributor, and the defendant was the battery manufacturer who also distributed batteries "through a branch office and its route trucks." *Id.* at 1337. Thus, the product that each of the parties offered included the distribution of an item. *See also Columbia Broadcasting System, Inc. v. Federal Trade Comm'n,* 414 F.2d 974 (7th Cir.1969) (records sold through record

clubs was separate market from all records sold through other means).

These cases are not analogous to the situation presented here. Unlike *Staples, Bon–Ton, Cardinal Health,* and *Chloride,* the *delivery* or the *place of sale* of the fountain syrup is not the product of Coca–Cola or PepsiCo; it is the product of the distributors and bottlers.[5] PepsiCo has adduced no evidence that Coca–Cola itself provides a product other than fountain syrup which, PepsiCo concedes, is not unique. Whatever mode of distribution Coca–Cola and its customers choose to use does not relate to the product definition. Thus, this factor weighs against a finding of a separate market for systems distribution of fountain syrup.[6]

Coca–Cola does not provide distribution services and derives no revenue from distribution. (Def.'s 56.1 Stmt. ¶ 191.) In *Pepsi I,* I addressed this issue and held that on the allegations in the Complaint the fountain syrup distributed through independent foodservice distributors could constitute a separate market. However, my determination was based on the allegation that customers view fountain syrup distributed by independent foodservice distributors to be different from fountain syrup distributed through other means and that "[i]n this way Coca–Cola creates a product that is unique in the purchasing eyes of an increasing number of restaurants, movie theaters, and other 'on-premise' accounts." *Pepsi I,* 1998 WL 547088, at *16. As discussed above, these allega-

---

5. Indeed, PepsiCo specifies the distributors at issue in the litigation as "independent." (Am. Compl.¶ 1.)

6. *JBL Enters., Inc. v. Jhirmack Enters., Inc.,* 698 F.2d 1011 (9th Cir.1983), provides further support. In *Jhirmack,* the distributors of hair care products in the professional salon market brought an antitrust action against the product manufacturer and its exclusive over-the counter market distributor. The *Jhirmack* court set forth a two-step process for market definition. "First the field in which the plaintiff was engaged must be defined in geographic and distributional terms. Then the product (or product line) that competes in that field

must be determined." 698 F.2d at 1016. The court of appeals upheld the district court's definition of the relevant distributional market. It determined that the plaintiff operated as a wholesaler, engaging in the distribution of Jhirmack products to specific retailers. *Id.* at 1016. As such, the plaintiff competed with other wholesalers for specific customers. *Id.* Here, PepsiCo and Coca–Cola operate as manufacturers, engaging in the production of fountain syrup which each company sends to certain distributors and bottlers. The distribution to consumers of fountain syrup is separate from the product line in the field in which PepsiCo and Coca–Cola are engaged.

tions are not supported by the evidence on the current motion.

Indeed, the inability to differentiate the fountain syrup product by distribution method undermines the assumption that the *Brown Shoe* analysis is at all relevant here. In *M.A.P. Oil Co. v. Texaco Inc.*, 691 F.2d 1303 (9th Cir.1982), the court determined that despite the fact that certain distribution services were "integral elements of the sale of gasoline," the evidence established that the plaintiffs derived income only from the sale of gasoline, not from a separate sale of distribution services. Based on this finding, the court did not apply the *Brown Shoe* factors.

> [T]he *Brown Shoe* indicia [are not] useful in identifying a submarket for distribution services. Those indicia are designed to compare the activities of two sellers to determine if their products or services compete in the same market or trade in separate markets. *Since plaintiffs here derived income only from the sale of gasoline and did not sell services separately, there are not two products or services to compare under Brown Shoe.* Customers can choose between direct delivery of gasoline and delivery through distributors or commission agents, but *in the final analysis they purchase a single product—gasoline.*

*Id.* at 1307–08 (emphasis added). While I question whether the *Brown Shoe* analysis is relevant on these similar facts, I nevertheless consider the remaining factors utilized in that analysis.

### 3. *Unique Production Facilities*

PepsiCo does not dispute that there are no unique production facilities for fountain syrup distributed through independent foodservice distributors. (*See* Pl.'s 56.1 Response ¶ 147). Instead, PepsiCo appears to argue that this factor is "Coke's criteria [sic]" that "focuses on the fountain syrup itself, not the specialized characteristics of "one-stop shopping that can only be provided by systems distributors." " (*Id.*) Contrary to PepsiCo's view, this criterion was set forth by the Supreme Court

in *Brown Shoe* and, under the facts presented here, suffers from the same infirmity that permeates the applicability of other *Brown Shoe* factors to these facts. The product that PepsiCo contends is at issue here is not really the fountain syrup, but the distribution method. The distribution method, however, is not a product of PepsiCo or Coca–Cola, but rather of the distributors and bottlers. Thus, this factor weighs against the finding of a separate market for distribution through systems distributors because PepsiCo and Coca–Cola do not engage in the distribution line of commerce.

### 4. *Distinct Customers*

PepsiCo suggests that I ignore the "appearance" of the nearly-identical distributor and bottle customers and instead focus on the "the need for operational efficiency by the outlet's owner" which, PepsiCo alleges, differentiates systems distributor customers from bottler customers. PepsiCo contends that the economic savings afforded chain customers who choose systems distribution creates a class of customers distinct from chain customers with identical-looking outlets for whom systems distribution is not an economic necessity. Thus, PepsiCo limits its definition of relevant customers to large restaurant chains with largely company-owned, not franchised, outlets with the additional specific characteristics described above. *See supra* part II. Again, PepsiCo's proffered definition of the distinct customers at issue begs the question, but in any event, the evidence does not support PepsiCo's gerrymandered customer definition.

First, PepsiCo admits that "while many movie theatre chains use bottler delivery, a growing number of them prefer to have their fountain products distributed through their systems distributors on a consolidated basis along with their other products." (Pl.'s 56.1 Response ¶ 105.) This supports Coca–Cola's view that the customer base cannot be limited to large restaurant

chains and that customers who use systems distributors for certain products also use bottlers for other products. Furthermore, PepsiCo admits that "systems distributors typically sell fountain syrup even to those customers who buy their bottles and cans from bottlers." (*Id.*) Thus, many of the differentiating operational efficiencies provided by systems distributors would not apply to those customers who "open their back doors" for bottlers and other distributors. PepsiCo has also noted that certain franchisees prefer systems distribution. (*See, e.g., id.* ¶ 129.) In addition, that certain customers who cannot receive systems distribution of Pepsi now receive Pepsi via bottler delivery only supports the view that the delivery method is not relevant to the market definition. (*Id.*)

PepsiCo has also not set forth evidence to dispute Coca–Cola's statistical analyses. As Coca–Cola points out, PepsiCo's own data show that company-owned outlets purchase only 27.5% (approximately) of the fountain syrup delivered to Coca–Cola's top fifty restaurant accounts. (*See* Romaine Decl. Exs. 12 (Coca–Cola's total fountain syrup volume to top fifty restaurant chains), 16 (Coca–Cola's total fountain syrup volume to company-owned outlets of top fifty restaurant chains).) Thus, 72.5% (approximately) of Coca–Cola's fountain syrup sales to the top fifty restaurant chains is to franchisees. (*See id.*)

PepsiCo seeks to justify its customer definition by touting that 97% of Coca–Cola's fountain syrup volume supplied to the company-owned outlets of the top fifty restaurant chains is delivered via systems distributors and that franchise-owned outlets bought more than 88% of the Coca–Cola fountain syrup that·was delivered by bottlers (and other non-foodservice distributors) to the top fifty restaurant chains. (*See* Romaine Decl. ¶ 3.) However, PepsiCo puts emphasis on the wrong figures. Accepting PepsiCo's definition of the foodservice distributor customer, the relevant consideration should be the percentage of customers of the foodservice distributor who meet PepsiCo's definition. One would assume if PepsiCo's definition were cor-

rect, a high percentage of Coca–Cola fountain syrup distributed through systems distributors would be to company-owned outlets. But PepsiCo has not made that relevant calculation, and an analysis of the data submitted by Coca–Cola shows that 63% of Coca–Cola's fountain syrup supplied to foodservice distributors is delivered to franchisee-owned restaurants. (*See* Second Dorman Decl. Ex. 15 (Coca–Cola franchisee-owned restaurant volume as percentage of total Coca–Cola foodservice distributor volume for restaurants).) This percentage negates PepsiCo's arguments for excluding franchisees from the relevant customer base. Thus, this factor weighs against PepsiCo's proffered market definition.

### 5. *Sensitivity to Price Changes*

As I noted in *Pepsi I*, if Coca–Cola can charge foodservice distributor customers more than it charges others, the foodservice distributor customers constitute a separate product market. *Pepsi I*, 1998 WL 547088, at *13. PepsiCo has adduced no evidence to show that foodservice distributor customers pay higher prices for fountain syrup than other customers. Rather, it takes a different approach; it warns of the so-called *Cellophane* fallacy which cautions that "[the] existence of significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power." *Eastman Kodak Co. v. Image Tech. Serv. Inc.*, 504 U.S. 451, 471, 112 S.Ct. 2072, 2084, 119 L.Ed.2d 265 (1992) (quoting Phillip Areeda & Louis Kaplow, *Antitrust Analysis* ¶ 340(b) (4th ed.1988) (emphasis in original)). PepsiCo contends that Coca–Cola's pricing to foodservice distributors is already at a supracompetitive level. To support its hypothesis, PepsiCo relies on the higher cost of bottler delivery to both PepsiCo and its bottler customers and the idea that Coca–Cola's profit margins on sales to foodservice distributor customers are higher than on sales to bottlers. However, PepsiCo has cited no case law to

support its view that differences in the cost of supply justify a finding of a separate market. As Coca–Cola points out, evidence of cost disparity may be highly relevant to evaluating the competitive significance of a defendant's conduct within an already-defined market but it cannot be used to define the market itself. *See United States v. American Can Co.,* 230 F. 859 (D.Md.1916).

Furthermore, PepsiCo has not submitted any evidence to show that Coca–Cola's prices are supracompetitive. As a matter of fact, there is no pricing evidence in the record before me at all. Even where Coca–Cola specifically points to the absence of pricing evidence, PepsiCo comes forth with no numbers. (*See, e.g.,* Def.'s 56.1 Stmt. ¶ 169; Pl.'s 56.1 Response ¶ 169.) All that appears is the most ephemeral and abstract discussion of cost of supply and its relation to PepsiCo's ability to provide fountain syrup at lower prices. (*See* Pl.'s 56.1 Response ¶ 142.)[7] Moreover, the fact that PepsiCo *could* offer lower prices if Pepsi distributed its syrup similarly to Coca–Cola simply does not show that Coca–Cola's present prices are supracompetitive. (*See id.*)

Accepting for the sake of argument that Coca–Cola's costs for systems distribution-delivered syrup are lower, PepsiCo's contention that Coca–Cola's margins must be higher because Coca–Cola does not vary its prices based on the method of delivery has no basis in the record. Not only has PepsiCo presented no evidence as to what Coca–Cola's margins actually are for any of the customers PepsiCo contends are at issue, but PepsiCo has not countered Coca–Cola's argument that Coca–Cola makes available to such customers discounts and allowances that are not based on delivery method. Furthermore, the evidence suggests that as a result of renewed competition in fountain syrup in recent years, Coca–Cola's prices and profits dropped. (*See* Def.'s 56.1 Stmt. ¶ 157; Dorman Decl. ¶ 12 & Exs. 13–14; *see also*

Gennaro Dep. Ex. 28 at PEP 004–2641 (PepsiCo strategic plan naming "Take margin out of fountain" as "Required Action").) PepsiCo has not submitted any contradictory evidence. Thus, I am unable to find that this factor supports a separate market for fountain syrup delivered through independent foodservice distributors.

6. *Specialized Vendors*

PepsiCo claims that it has met this criterion because foodservice distributors offer unique efficiencies through their consolidated delivery system. However, PepsiCo's argument is circular. PepsiCo wants to define the product by its distribution method through a particular type of vendor, *i.e.,* fountain syrup "delivered through independent foodservice distributors." Thus, PepsiCo is essentially arguing that fountain syrup distributed through independent foodservice distributors has specialized vendors, *i.e.,* independent foodservice distributors. This does not make sense for obvious reasons. Thus, this factor does not weigh in favor of finding a separate product market.

For the above reasons, PepsiCo's relevant market definition cannot be sustained and, therefore, the monopolization and attempted monopolization claims must fail.

III. Section 1 of the Sherman Act.

▮ To prove a Section 1 violation of the Sherman Act, a plaintiff must show " 'a combination or some form of concerted action between at least two legally distinct economic entities' that 'constituted an unreasonable restraint of trade either *per se* or under the rule of reason.' " *Primetime 24 Joint Venture v. National Broadcasting Co.,* 219 F.3d 92, 103 (2d Cir.2000) (quoting *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.,* 996 F.2d 537, 542 (2d Cir.1993)). Under the rule of reason, a Section 1 violation requires a showing of injury to competition in the relevant mar-

7. This absence of pricing information follows approximately eighteen months of multi-track

aggressive discovery which both sides agreed was justified because this is the "Cola Wars."

ket. *See Capital Imaging Assocs.,* 996 F.2d at 537; *National Ass'n of Freelance Photographers v. Associated Press,* No. 97 Civ. 2267, 1997 WL 759456, at *9 (S.D.N.Y. Dec. 10, 1997). Because PepsiCo has failed properly to define the relevant market here, there can be no Section 1 violation under a rule of reason analysis.

 The Amended Complaint alleges that Coca–Cola's loyalty policy is, in reality, a *per se* illegal horizontal conspiracy among the foodservice distributors and Coca–Cola to boycott PepsiCo. This allegation is not supported by the evidence or the law. In a recent decision, the Supreme Court stated, "precedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors." *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 134, 119 S.Ct. 493, 498, 142 L.Ed.2d 510 (1998). Thus, the Supreme Court reaffirmed the need to demonstrate an agreement between or among direct competitors. Under the facts of this case, PepsiCo must show a horizontal agreement among foodservice distributors to boycott PepsiCo. PepsiCo has made no such showing. The only evidence PepsiCo relies upon is an inference of implied understanding amongst certain foodservice distributors that Coca–Cola enforced the same loyalty policy with each of its foodservice distributers. (*See* Pl.'s 56.1 Counterstmt. ¶ 142.) This is not sufficient to show an agreement among the distributors to boycott PepsiCo. Indeed, in *Pennsylvania v. PepsiCo, Inc.,* 836 F.2d 173, 180 (3d Cir.1988), the court rejected the argument that PepsiCo's enforcement of a vertical distribution restraint through communications with its bottlers could be characterized as a horizontal restraint of trade. The court found the absence of any agreement or conspiracy "attributable solely to the competing bottlers, without PepsiCo" dispositive. *Id.* Here, PepsiCo has suggested that the same conduct, a supposed "hub-and-

spokes conspiracy," constitutes a Section 1 violation. Again, without evidence of an agreement "attributable solely" to the independent foodservice distributors, without Coca–Cola, PepsiCo has failed to show a Section 1 violation.[8]

## CONCLUSION

For the foregoing reasons, Coca–Cola's motion for summary judgment is granted. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED.

---

**8.** PepsiCo's citation to cases that involve price-fixing are inapplicable to the facts of this action. Price-fixing is illegal *per se* even where the arrangement is purely vertical. *See*

*Monsanto v. Spray–Rite Service Corp.,* 465 U.S. 752, 762–64, 104 S.Ct. 1464, 1470, 1472, 79 L.Ed.2d 775 (1984).