**PEPSICO, INC., Plaintiff,**

v.

**CENTRAL INVESTMENT
CORPORATION, INC.,
et al., Defendants.**

No. C–1–98–389.

United States District Court,
S.D. Ohio,
Western Division.

April 26, 2001.

Stephen Jospeh Butler, Renee S. Filiatraut, Thompson Hine LLP, Cincinnati, OH, Roger Pascal, John C. Martin, Thomas Paul Luning, James A. Clark, Caroline K. Sheerin, Kevin S. Hovis, Annaliese F. Fleming, Anne Hall Burkett, Robin M. Spencer, Thomas B. Quinn, Schiff Hardin & Waite, Chicago, IL, Gerard W. Casey, PepsiCo Inc. Law Dept., Purchase, NY, Robert A. McMahon, Eberly McMahon Hochscheid LLC, Cincinnati, OH, for PepsiCo, Inc.

G. Jack Donson, Jr., Taft Stettinius & Hollister, Cincinnati, OH, James Burdette Helmer, Jr., Helmer Martins & Morgan, Cincinnati, OH, Helen G. Kirsch, Judith L. Harris, William A. Georghegan, Reed Smith Shaw & McClay, Washington, DC, for Central Investment Corp.

James Burdette Helmer, Jr., Helmer Martins & Morgan, Cincinnati, OH, for Pepsi-Cola Bottling Co. of Ft. Lauderdale-Palm Beach, Inc.

## ORDER

BECKWITH, District Judge.

This matter is before the Court on the motions for summary judgment (Doc. Nos. 202 & 203) filed by Defendants Central Investment Corporation and Pepsi–Cola

Bottling Company of Ft. Lauderdale–Palm Beach, Inc. In their first motion, Defendants seek summary judgment in their favor as to each count of Plaintiff PepsiCo, Inc.'s Amended Complaint. In their second motion, Defendants seek partial summary judgment on their counterclaim for a declaratory judgment that open commissary delivery is not a permissible means of service under the terms of the Syrup Appointments entered into by the parties. For the reasons set forth below, both Defendants' motions for summary judgment are well-taken and are **GRANTED**. Defendants also have before the Court a Motion to File Supplemental Memorandum In Support of Motion for Summary Judgment as to PepsiCo's Amended Complaint (Doc. No. 238). In light of the Court's rulings on the summary judgment motions, Defendants' motion to file a supplemental memorandum is **MOOT**.

## I. *Background*

The parties in this case are PepsiCo, Inc. ("PepsiCo"), a well-known manufacturer of soft drinks, Central Investment Corporation, Inc. ("CIC") and Pepsi–Cola Bottling Company of Ft. Lauderdale–Palm Beach, Inc. PepsiCo is a North Carolina corporation with its principal place of business located in Purchase, New York. Defendant CIC is an Ohio corporation with its principal place of business in Cincinnati. Defendant Pepsi–Cola Bottling Company of Ft. Lauderdale–Palm Beach, Inc. is a Florida corporation and wholly-owned subsidiary of CIC. For ease of reference, the Court will collectively refer to the Defendants as "CIC." CIC sells and distributes Pepsi products in defined geographic areas of Ohio and Florida.

The dispute in this case arises out of Bottling and Syrup Appointments[1] entered into by the parties in the late 1950's and early 1960's. In exchange for the exclusive right to distribute Pepsi and Pepsi products, the appointments require CIC "to push vigorously" and "secure full distribution" of Pepsi within its assigned territories. The appointments are governed by New York law and are terminable by PepsiCo for CIC's failure to comply with one or more terms of the Appointments.

The Bottling and Syrup Appointments originally provided only for what the parties call "store door" delivery; that is, CIC would deliver directly to each customer its requirements for Pepsi products. In 1985, the Syrup Appointment was amended to allow Pepsi syrup to be delivered to what the amendment calls National Account Customers[2] via a self-distribution system, or "closed commissary." A closed commissary is a distribution center which is owned by the customer and provides a central location for delivery of syrup. The customer-owned distribution center then takes responsibility for delivering the syrup to the individual restaurants along with the other supplies. The amendment to the Syrup Appointment reserved to PepsiCo the right to sell syrup to National Account Customers. *See* Doc. No. 202, Ex. 4, Amendment to Syrup Appointment ¶ 10(a).

---

1. The Bottling Appointment covers CIC's right to sell and distribute Pepsi products in cans or bottles. The Syrup Appointment covers CIC's right to sell Pepsi syrup to customers for individual cup sales through fountain machines.

2. A "National Account Customer" is a customer with chain or multiple outlet operations and cup vending machine operations within CIC's exclusive territories and in one or more territories of other independent Pepsi distributors. *See* Doc. No. 202, Ex. 4, Amendment to Syrup Appointment ¶ 10(a). The most prominent example of a National Account Customer is Tricon Corporation, which owns the fast food restaurants Pizza Hut, Taco Bell, and Kentucky Fried Chicken. PepsiCo once owned the Tricon restaurants but spun them off for competitive reasons.

The amendment gave CIC the right to manufacture and deliver syrup to closed commissaries of National Account Customers if the closed commissary was located within CIC's territory. *See id.* ¶ 10(c)(i). In exchange for that service, PepsiCo agreed to pay CIC a fee at a rate to be determined from time to time by PepsiCo. *Id.* If the commissary was located outside of CIC's territory but delivered syrup to outlets within CIC's territory, PepsiCo agreed to pay CIC a "Brand Delivery Fee" equal to 8% of the PepsiCo's list price for store door delivery of syrup. *See id.* ¶ 10(c)(ii).

A competing form of syrup delivery is "open commissary" delivery. An open commissary is a delivery operation which is independent of both PepsiCo and the National Account Customer. Like the closed commissary, however, the open commissary provides one-stop shopping for the restaurant. For a number of years after the parties executed the Amendment to the Syrup Appointment, a course of performance between PepsiCo and CIC established that open commissary delivery was not a method of delivery available under the Syrup Appointment. *See* Doc. No. 202, Exs. 28 & 32 ("We [PepsiCo] have acknowledged to you [CIC] that the form of delivery in question [open commissary] is not permitted under the terms of Paragraph 10 of your Pepsi–Cola Syrup Appointments."). In other words, a National Account Customer would either have to have syrup delivered by store door delivery to each of its outlets or operate its own self-distribution system or closed commissary. If a National Account Customer insisted on receiving syrup through an open commissary, PepsiCo would obtain from CIC a waiver on an individual basis. *See id.*

According to PepsiCo, in or about the mid–1990's, National Account Customers began requesting open commissary delivery of syrup with increasing frequency. It is clear from the papers and exhibits submitted that PepsiCo views the ability to provide open commissary delivery of fountain syrup to be an important aspect of competing with it chief rival, the Coca–Cola Company. It is also apparent that PepsiCo came to view the process of obtaining waivers on a case-by-case basis to permit open commissary delivery as being too time consuming and non-responsive to the needs of National Account Customers. *See, e.g.,* Doc. No. 202, Ex. 44, Letter from PepsiCo to Independent Bottler ("Per previous discussions regarding the broader Fountain Limited Waiver proposed by the Pepsi–Cola Company, we are not in a position to sign limited waivers on an account-by-account basis. We cannot effectively sell and negotiate in the National Account arena with that type of restriction."). Therefore, in 1997, PepsiCo embarked on an initiative to obtain from all of the independent bottlers a blanket agreement which would allow PepsiCo to provide open commissary service to National Account Customers at will. An example of the this agreement (also known as "the 1997 waiver") is shown at Exhibit 35 of CIC's motion for summary judgment. *See* Doc. No. 202, Ex. 35. In its basic form, the agreement compensates the independent bottler on per-gallon basis for syrup delivered via open commissary in exchange for waiving the limitations on open commissary delivery imposed by paragraph 10(c) of the 1985 Amendment to the Syrup Appointment. *See id.* PepsiCo claims that over 95% of its independent bottlers signed the 1997 waiver. However, there were a number of bottlers, including CIC, who refused to give PepsiCo blanket permission to provide open commissary service to National Account Customers.

Another impediment to PepsiCo's ability to provide syrup through open commissaries was Coke's open commissary policy.

Coke had in its agreements with open commissaries a "loyalty clause" which provided that the commissary could distribute Coca–Cola products only on the condition that it not sell or distribute any competing products, i.e., PepsiCo products. In May, 1998, PepsiCo filed an antitrust lawsuit against Coke in the United States District Court for the Southern District of New York. In that lawsuit, PepsiCo claimed that Coke's enforcement of the loyalty clause against independent commissaries was a restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and monopolization and/or attempted monopolization under § 2 of the Sherman Act, 15 U.S.C. § 2. *See PepsiCo, Inc. v. The Coca–Cola Co.*, 114 F.Supp.2d 243, 245 (S.D.N.Y. 2000).

The preceding background brings us to the two events which by and large were the flashpoints which ignited this lawsuit.

In January 1998, CIC sent through its counsel a letter to PepsiCo CEO Roger Enrico which stated that CIC had learned through various unidentified sources that PepsiCo intended to service Tricon restaurants in CIC's exclusive territories through open commissary delivery. The letter reiterated to Mr. Enrico that PepsiCo's past policy had been that paragraph 10(c) of the Amendment to the Syrup Appointment prohibited PepsiCo from providing open commissary delivery. The letter further stated that CIC considered any delivery of syrup to National Account Customers via open commissary to be a violation of the Syrup Appointment and that it would take all legal action necessary to protect its franchise rights. Finally, CIC sent a copy of the letter to Tricon as a warning that participation in open commissary delivery in violation of the Syrup Appointment would be met with legal action. *See* Doc. No. 202, Ex. 64.

By the spring of 1998 CIC had not yet signed the blanket 1997 waiver, but it also appears that CIC had not definitively decided against it either. The record reflects correspondence from CIC to PepsiCo requesting that PepsiCo provide information, primarily financial data, which would assist CIC in determining whether to sign the 1997 waiver. *See* Doc. No. 202, Exs. 70–72. It appears, however, that PepsiCo did not provide any of the information requested by CIC. *See id.* Ex. 73.

The fateful day in this case was June 1, 1998. On that particular day CIC CEO Bud Koons and CIC President Richard Caudill met with PepsiCo CEO Roger Enrico at his office in Purchase, New York. The purported goal of the meeting was to iron out the parties' differences on open commissary delivery. PepsiCo describes the meeting as an "ambush" by CIC. Pepsi claims that during the meeting Mr. Koons and Mr. Caudill presented Mr. Enrico with "exorbitant" demands for compensation and additional exclusive territories at no cost in return for agreeing to the 1997 waiver. Further outraging PepsiCo, the CIC executives showed Mr. Enrico a draft intervenor's complaint and 97 discovery requests. According to Mr. Enrico, Mr. Koons and Mr. Caudill threatened to file these documents in the Pepsi/Coke antitrust case then pending in the Southern District of New York unless PepsiCo acceded to their demands within 24 hours. Although there is no question that CIC presented those documents to Mr. Enrico, CIC denies that it made any ultimatums or presented deadlines to PepsiCo.

The proposed intervenor's complaint presented two claims for breach of the Syrup Appointment and one claim for a declaration of CIC's rights under the Syrup Appointment. In its declaratory judgment claim, CIC sought a declaration that the Syrup Appointment grants to CIC the perpetual right to distribute syrup to all

National Account Customers within its territories except for those National Account Customers who operate a closed commissary. *See* Doc. No. 75, Proposed Intervenor's Complaint, ¶ 36. PepsiCo believed that the proposed intervenor's complaint aligned CIC with Coke and against it. The motion in support of the intervenor's complaint bears out that belief:

CIC's complaint shares the same questions of fact as PepsiCo's complaint inasmuch as the central issue between PepsiCo and Coke and CIC and PepsiCo is whether National Account Customers require delivery of Beverage Syrup through open commissaries as a condition of doing business.

PepsiCo makes this the linchpin of its Complaint against Coke when it alleges that it is unable to "compete on the merits for the business of customers that require delivery through foodservice distributors." The core of CIC's complaint against PepsiCo lies in CIC's contention that PepsiCo's allegation is untrue, that National Account Customers generally do not require open commissary delivery and will still do business with PepsiCo even when delivery of Beverage Syrup comes from PepsiCo bottlers such as CIC. *This same contention is at the heart of Coke's defense against PepsiCo's antitrust challenge— if Coke can show that there is no sizably significant market of National Account Customers who require commissary delivery as a condition of doing business then Coke will have defeated PepsiCo's monopolization claim.*

*See* Doc. 202, Ex. 76, Motion to Intervene ¶¶ 8–9 (emphasis added). Even if the motion to intervene would not have made CIC and Coke allies, clearly proof supporting CIC's position would have assisted Coke in prevailing on PepsiCo's antitrust claims. It is undisputed, however, that CIC never followed through on its threat to intervene in the Pepsi/Coke case. In

fact, the district judge recently granted summary judgment in Coke's favor on PepsiCo's antitrust claims, specifically finding that: "Despite one-stop shopping's advantageous features, the evidence does not show that the preference for independent foodservice distributors is so strong so as to eliminate delivery through other means as an acceptable alternative." *PepsiCo, Inc. v. The Coca–Cola Company,* 114 F.Supp.2d 243, 250 (S.D.N.Y.2000).

On June 2, 1998, the day after the Koons–Caudill–Enrico meeting, PepsiCo filed the instant lawsuit against CIC. PepsiCo then filed an Amended Complaint on June 15, 1998 (Doc. No. 15). Count I of the Amended Complaint alleged that CIC's actual and threatened interference with PepsiCo's efforts to provide open commissary delivery to its National Account Customers was a material breach of CIC's duties under the Syrup Appointment to "push vigorously" and "secure full distribution of" Pepsi syrup. Count I also alleged that these same actions were a material breach of CIC's duty of good faith and fair dealing in the performance of the Syrup Appointment. Finally, Count I alleged that CIC's threat to intervene in the Pepsi/Coca–Cola litigation unless PepsiCo acceded to CIC's compensation demands was also a breach of its duty of good faith and fair dealing. Count I sought a declaratory judgment that CIC materially breached the terms of the Syrup Appointment and that the appointment is therefore terminated. Count I also sought an award of compensatory damages.

Count II of the Amended Complaint alleged that CIC's actions constitute a material breach of its duties of good faith and fair dealing under the Bottling Appointment. Count II sought a declaratory judgment that CIC breached the terms of the Bottling Appointment, causing it to be

terminated, and an award of compensatory damages.

Count III of the Amended Complaint alleged that by entering into the Syrup and Bottling Appointments, CIC has agreed to promote and advance PepsiCo's interests, and to refrain from advancing the interests of PepsiCo's competitors. Count III alleged that CIC's agreement to promote and advance PepsiCo's interests gave rise to a duty of loyalty and care to PepsiCo on the part of CIC. Count III claimed that CIC's actual and threatened interference with PepsiCo's sales to existing and potential National Account Customers, and CIC's threat to intervene in the Pepsi/Coca–Cola litigation, were material breaches of its duties of loyalty and care. Count III sought a declaratory judgment that CIC's actions constitute material breaches of the Syrup and Bottling Appointments, thereby terminating them, and an award of compensatory damages.

On August 3, 1998, CIC filed a motion to dismiss (Doc. No. 7). In its motion CIC argued that PepsiCo's claims against it should be dismissed because PepsiCo has failed to state a claim for a breach of the best efforts clause in the Syrup Appointments. CIC further contended that its refusal to relinquish its distribution rights is not a breach of its duty of good faith and fair dealing. Finally, CIC argued that hard bargaining and representing that it is willing to litigate to vindicate its contract rights is not a basis for terminating the Syrup and Bottling Appointments.

On June 15, 1999, the Court entered an order (Doc. No. 37) granting in part and denying part CIC's motion to dismiss. In ruling on the motion, the Court agreed with CIC that it could not have breached its duties to "push vigorously" and "secure full distribution" of Pepsi syrup by merely refusing to accede to PepsiCo's demands to permit open commissary delivery within its territories. On the other hand, the Court commented that these clauses seemed to imply a duty on the part of CIC to lend a certain amount of cooperation to PepsiCo in its efforts to make sales to National Account Customers. The Court suggested that the parties seemed to have developed a course of performance under the Syrup Appointment in which PepsiCo would obtain waivers from CIC to permit open commissary delivery and that CIC may have breached the contract by threatening customers with litigation before PepsiCo had had an opportunity to secure a waiver from CIC. The Court next agreed with CIC that it was permitted to protect its contractual interests, but suggested that CIC could be liable for breaching the Syrup Appointment by threatening to intervene in the Pepsi/Coke case if that act were shown to be manifestly harmful. The Court did agree with CIC, however, that there could be no liability for making compensation demands which PepsiCo found to be outrageous.

The Court next held that although parties to an arms-length commercial transaction generally do not owe a fiduciary duty to one another, in rare instances such a duty may arise between a franchisor and a franchisee, particularly where one party has reposed its trust in another. The Court found that from the facts alleged a jury could find that PepsiCo and CIC had a fiduciary relationship due to the length of their business relationship and because PepsiCo alleged that it had given CIC access to its secret processes and formulas. The Court suggested that CIC might have breached that fiduciary duty by threatening to intervene in the Pepsi/Coke case. The Court also stated that CIC may have breached a fiduciary duty to PepsiCo by threatening litigation against the National Account Customer before PepsiCo could obtain a waiver from CIC.

On September 17, 1999, CIC filed an Answer and Counterclaim (Doc. No. 50). For present purposes, the relevance of the Counterclaim is that at Count IV CIC seeks a declaratory judgment it has the exclusive right under the Syrup Appointment to deliver syrup to National Account Customers by store door delivery except for those customers who both operate a closed commissary and require delivery of fountain syrup through the closed commissary as a condition of doing business. CIC further seeks a declaratory judgment that PepsiCo does not have the right to provide open commissary delivery services within its territories.

After a lengthy and contentious period of discovery, on January 5, 2001, CIC filed a motion for summary judgment (Doc. No. 202) as to each of PepsiCo's claims in the Amended Complaint. In its motion, CIC argues that PepsiCo cannot prevail on its breach of contract claims because PepsiCo has sustained no damages. CIC argues that its litigation threat letter to the National Account Customer did not cause PepsiCo to lose any business. Regarding its threats to intervene in the Pepsi/Coke case, CIC points out that it never did intervene in the case and that PepsiCo lost the case even without its intervention. Therefore, CIC argues, PepsiCo suffered no damages from its threat. CIC also claims that its threat letter to the National Account Customer and its threat to intervene in the Pepsi/Coke case are protected by *Noerr–Pennington* immunity, which protects a party from antitrust liability for petitioning the courts or the government, but has been extended by some courts to cover activities under other areas of the law. Otherwise, CIC argues that it has not breached any of its duties because it has never failed to push vigorously Pepsi products. Furthermore, CIC argues that PepsiCo cannot demonstrate that it has lost any National Account business as a result of CIC's actions. In response, to this argument, PepsiCo argues that it need not prove any actual monetary damages in order to terminate CIC's Appointments.

On the same day, CIC filed its motion for partial summary judgment on its Counterclaim for a declaratory judgment. As explained further below, whether CIC breached any of its duties to PepsiCo, thereby giving PepsiCo grounds to terminate the Syrup Appointment, turns largely on the interpretation of the Syrup Appointment and the 1985 Amendment.

CIC's motions for summary judgment have been fully briefed and are now ready for disposition.

## II. The Summary Judgment Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

The Court will not grant summary judgment unless it is clear that a trial is unnecessary. The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only

by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.*

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 472, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). "[T]he issue of material fact required by Rule 56© ... to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial." *First National Bank v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, *Smith v. Hudson,* 600 F.2d 60, 63 (6th Cir.), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a

jury to return a verdict for that party. *Id.* at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. Significantly, the Supreme Court also instructs that the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence. *Id.; Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.*

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim. *Id.* Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits." Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

### III. *Analysis*

As alluded to in the statement of facts, all of PepsiCo's claims essentially arise out of two events. The first event is when CIC sent the letter to Tricon stating that it would take legal action to protect its contractual right to prevent open commissary delivery its territories. The second event was CIC's threat to intervene in the Pepsi/Coke case, which PepsiCo took to mean that CIC was siding with Coke in

that action. With those two actions, Pepsi-Co claims that CIC breached its duties to "push vigorously" and "secure full distribution" of Pepsi syrup within its territories and breached a fiduciary duty owed to PepsiCo. As noted above, the legal consequence of these actions turns largely on the meaning of the Syrup Appointment. Therefore, it is appropriate to first address CIC's motion for partial summary judgment on its declaratory judgment claim.

### A. Declaratory Judgment

■■■ The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). As an initial matter, the Court addresses PepsiCo's contention the Court should exercise its discretion not to grant a declaratory judgment in this case because a declaratory judgment here will not settle the legal relations between the parties because of its outstanding claim to terminate CIC's Syrup and Bottling Appointments. PepsiCo is correct that a court should not exercise jurisdiction over a declaratory judgment action where it will not clarify and settle the legal relations between the parties or terminate and afford relief from the uncertainty giving rise to the proceeding. See Aetna Casualty & Surety Co. v. Sunshine Corp., 74 F.3d 685, 687 (6th Cir.1996). In assessing whether to exercise jurisdiction, the district court should consider the following factors: 1) whether the declaratory action would settle the controversy; 2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; 3) whether the declaratory remedy is being used merely for the purpose of

"procedural fencing" or "to provide an arena for a race for res judicata"; 4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and 5) whether there is an alternative remedy which is better or more effective. Id.

■■■ In this case, the third and fourth factors are inapplicable. There as been no procedural fencing or racing to the courthouse by the parties. Issuing a declaratory judgment in this case will not increase friction between federal and state courts nor encroach improperly on state jurisdiction. The Court sees no remedy which would be more effective for CIC. While the Court tends to agree that a declaratory judgment will not settle the controversy, it does serve a quite useful purpose in clarifying the legal relations at issue. As the Court has stated, it is virtually impossible to determine whether CIC breached the Syrup Appointment without first ascertaining what rights each party possessed thereunder. Accordingly, the Court finds that exercising jurisdiction over CIC's declaratory judgment claim at this time is appropriate.

■■■ The Court starts the analysis by setting forth the relevant contractual language. The Syrup Appointment provides in relevant part:

> 9. The Bottler will push vigorously the sale of Beverage syrup in the Territory and will secure full distribution thereof in the Territory.
>
> . . . . .
>
> 10. The Company reserves the right to sell Beverage syrup to chain or multiple-outlet operations and cup vending machine operators in the Territory. Except as provided in this paragraph, the Bottler's right to sell Beverage

syrup in the Territory shall be exclusive.

*See* Doc. No. 202, Ex. 12, Syrup Appointment ¶¶ 9–10. Although the terms "push vigorously" and "secure full distribution" may be a somewhat ambiguous, as the Court noted in ruling on CIC's motion to dismiss, paragraph 9 reads like a "best efforts" clause under which CIC has a duty to do its best to sell and promote Pepsi syrup within its territories. The plain language of paragraph 10 gives CIC the exclusive right to sell Pepsi syrup within its territories except that PepsiCo has the right to sell syrup to chain or multiple outlet operations, operations later defined as National Account Customers. *See American Express Bank, Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 562 N.Y.S.2d 613, 614 (N.Y.App.Div.1990) (words and phrases of contract should be given their plain meaning; court should enforce plain meaning of agreement). Although the Syrup Appointment does not provide for a specific termination date, it is apparently undisputed that except for grounds for termination for cause, *see* Syrup Appointment ¶ 13, the rights granted to CIC under the agreement are perpetual. *See e.g.* Doc. No. 202, Ex. 1, at 2.[3] In any event, PepsiCo does not challenge CIC's assertion that its Syrup Appointment is of infinite duration (absent good cause for termination).

In 1985, paragraph 10 of the Syrup Appointment was amended to allow the distribution of Pepsi syrup to National Account Customers through closed commissaries in exchange for a payment of a brand development fee to CIC. *See* Doc. No. 202, Ex. 4. From that time until the time PepsiCo decided that its distribution system did not meet the needs of the National Account Customers, it consistently acknowledged to CIC that open commissary delivery was not permitted under paragraph 10. *See* Doc. No. 202, Exs. 27, 28, 31, 32. Furthermore, whenever open commissary delivery was required for a National Account Customer, PepsiCo always sought to obtain a waiver from CIC. *See id.* These letters establish not only that open commissary delivery is not available under the terms of the Syrup Appointment, but also that PepsiCo needs CIC's consent to provide that service for National Account Customers. *See Federal Ins. Co. v. American Ins. Co.*, 258 A.D.2d 39, 691 N.Y.S.2d 508, 512 (N.Y.App.Div.1999) ("[T]he parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties.") (internal quotes omitted); *see also* Restatement (Second) of Contracts § 202(4) (1981) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given

---

**3.** Exhibit 1 is a letter from PepsiCo CEO Roger Enrico to CIC President Richard Caudill. Although the letter refers to the Bottling Appointment and not the Syrup Appointment, the language and the structure of the two documents are very similar. *Compare* Bottling Appointment, Doc. No. 202, Ex. 11 *with* Syrup Appointment, Doc. No. 202, Ex. 12; *see also* PepsiCo Memorandum in Opposition, Doc. No. 219, at 6 n. 4 ("CIC Exhibits 11 and 12 consist of multiple appointments, each of which contain substantially identical provisions."). In the letter Mr. Enrico states:

First, it has been said that the company, in a counterclaim arising from the Gencorp lawsuit, challenged the perpetuity of your franchise appointment. This is absolutely not true. The company has never challenged the perpetuity clause of your Bottling Appointment.

. . . . .

[T]here is no question in the company's mind regarding the perpetuity of your Bottling Appointments.
*See id.* at 2.

great weight in the interpretation of the agreement."); Restatement (Second) of Contracts § 209, Comment a (1981) ("[B]oth integrated and unintegrated agreements are to be read in the light of the circumstances and may be explained or supplemented by operative usages of trade, by the course of dealing between the parties, and by the course of performance of the agreement.").[4]

 PepsiCo contends that the language of the Syrup Appointment and the 1985 Amendment are ambiguous because they do not address the situation where the customer demands open commissary services as a condition of doing business with PepsiCo. Whether an ambiguity exists in a contract is a threshold question of law for resolution by the trial court. *Brass v. American Film Tech., Inc.*, 987 F.2d 142, 149 (2d Cir.1993). Silence per se on a particular issue does not render a contract ambiguous. *Jacobs v. Carsey–Werner Dist., Inc.*, No. 93 Civ. 6825, 1994 WL 116077, at *2 (S.D.N.Y. Mar.30, 1994). Silence only creates an ambiguity where the contract is silent on issues necessary to construe the agreement's written provisions. *Id.* In this case, the fact that the agreement does not say what to do when a customer demands open commissary delivery, or else it will take its business elsewhere, does not render the other clear provisions of the agreement ambiguous. At most, customer demand for open commissary delivery was an unforseen circumstance which makes PepsiCo's ability to serve its customers burdensome, but not impossible. In such a scenario, an unforeseen circumstance cannot be used to alter or amend the clear terms of the agreement. *See Kel Kim Corp. v. Central Mar-kets, Inc.*, 70 N.Y.2d 900, 524 N.Y.S.2d 384, 519 N.E.2d 295, 296–97 (1987).

Finally, PepsiCo claims that a genuine issue of fact which precludes summary judgment is presented as to the purpose of submitting individual waivers for open commissary delivery to CIC. PepsiCo contends that the individual waivers were not concessions that open commissary delivery is not permissible under the Syrup Appointments, but rather were submitted to avoid becoming embroiled in lawsuits with local bottlers. PepsiCo essentially claims that it could have provided open commissary to National Account Customers all along but used the individual waivers to humor the bottlers. The Court finds PepsiCo's position to be without merit. PepsiCo's argument flies in the face of the clear language of the waivers, which unambiguously acknowledges that open commissary delivery is not permitted under the terms of the Syrup Appointment and says nothing about reserving rights or wishing to avoid litigation with the bottlers. *See Benderson Dev. Co., Inc. v. Schwab Bros. Trucking, Inc.*, 64 A.D.2d 447, 409 N.Y.S.2d 890, 897 (N.Y.App.Div.1978) ("[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found therein."). Moreover, PepsiCo's subjective, unexpressed intent in submitting the waivers to CIC is irrelevant in determining their legal effect. *See Schmidt v. Magnetic Head Corp.*, 97 A.D.2d 151, 468 N.Y.S.2d 649, 654 (N.Y.App.Div.1983).

In conclusion, the Court finds that the language of the Syrup Appointment and the 1985 Amendment thereto is clear and unambiguous. These writings provide that

---

4. The Court also observes that the individual waivers are essentially subsequent agreements, the admission of which does not violate the parol evidence rule. *See Backer v. Lewit*, 180 A.D.2d 134, 584 N.Y.S.2d 480, 482 (N.Y.App.Div.1992) ("[T]he parol evidence rule has no application to a subsequent agreement or subsequent oral modification of a written contract.").

the CIC has the exclusive right to deliver Pepsi syrup to National Account Customers on a store-door basis except for those accounts requiring closed commissary delivery as a condition of doing business. Open commissary delivery is not a permissible service option. The fact that the agreements do not address the situation where a customer demands open commissary delivery does not make them ambiguous. In fact, the Court finds no evidence in the record that PepsiCo has even been confronted with that situation. In any event, it is simply an occasion where PepsiCo has to make a separate agreement with CIC to provide the service or provide better incentives for CIC to agree to the 1997 blanket agreement, as other bottlers have done. The record does not reflect that CIC is totally opposed to permitting open commissary delivery to National Account Customers; it does, however, reflect opposition to take-it-or-leave-it deals. In summary, the Court finds that CIC's interpretation of the Syrup Appointment and the 1985 Amendment is the correct one.

Accordingly, CIC's motion for partial summary judgment on Count IV of the Counterclaim is well-taken and is GRANTED.

### B. *Summary Judgment as to PepsiCo's Claims*

 Having determined that the Syrup Appointment requires PepsiCo to obtain CIC's permission before commencing open commissary delivery to National Account Customers, the Court must determine whether CIC breached any of its duties to PepsiCo. The above discussion has shown that although PepsiCo has the right to sell syrup to National Account Customers, it does not have the unilateral right to sell open commissary delivery along with it. PepsiCo claims that CIC breached its duties to "push vigorously" and "secure full distribution" of Pepsi, and breached its duty of good faith and fair dealing, under the Syrup Appointment by threatening to interfere with its sales of syrup to National Account Customers. Under some circumstances, issuing a threat of litigation to a third party is an appropriate means of protecting one's contractual rights and, absent malice or fraud, no liability for doing so will follow. *See Murray v. SYSCO Corp.*, 273 A.D.2d 760, 710 N.Y.S.2d 179, 818 (N.Y.App.Div.2000).[5]

In ruling on the motion to dismiss, however, the Court suggested that the course of performance between the parties might require CIC to wait for PepsiCo to present a waiver to it and stated that CIC might have jumped the gun in threatening litigation against Tricon as it did. Although the Court has held that the parties' course of performance has established the contours of their rights under the Syrup Appointments, because PepsiCo claims that the CIC threat letter interfered with its sales to Tricon, it has the burden of establishing the details of the course of performance relative to the waiver procedure. *See Alesayi Beverage Corp. v. Canada Dry. Corp.*, 947 F.Supp. 658, 666 (S.D.N.Y.1996) (under New York law, plaintiff bears burden of proving breach of contract by preponderance of the evidence).

In its memorandum in opposition, PepsiCo argues that CIC jumped the gun because it had no reasonable basis for believ-

---

**5.** *Murray* actually involved a claim for tortious interference with contract after the defendant sent a letter to the plaintiff's employer seeking its help in enforcing a non-compete clause contained in an employment contract between the plaintiff and the defendant. *See id.* at 180. The court held that the defen-

dant's economic interest justified the sending of the letter. *Id.* at 181. While the Court recognizes that PepsiCo has not asserted a claim against CIC for tortious interference with contract, the factual situations are analogous because PepsiCo claims that CIC interfered with *its* sales to *its* customers.

ing that PepsiCo was about to begin open commissary shipments into its territories. PepsiCo points out that it had always negotiated account-specific waivers with non-signing bottlers where necessary to meet the customer's needs. The Court notes, however, that the deposition testimony of Pepsi executives cited by PepsiCo only shows that it had been able to negotiate waivers in the past, but says nothing about whether PepsiCo intended to attempt to obtain a waiver from CIC in the Tricon case. In fact, considerable evidence supports a conclusion that by that time PepsiCo had rejected the idea of presenting waivers on a case-by-case basis and intended to provide open commissary delivery to Tricon regardless of CIC's position on the matter. *See, e.g.*, Doc. No. 202, Ex. 44, Letter from PepsiCo to Independent Bottler ("Per previous discussions regarding the broader Fountain Limited Waiver proposed by the Pepsi–Cola Company, we are not in a position to sign limited waivers on an account-by-account basis. We cannot effectively sell and negotiate in the National Account arena with that type of restriction."); Doc. No. 209, PepsiCo CEO Roger Enrico Dep. at 659 ("My own view was . . .the national accounts are ours and we can ship to them any way we choose to."); Pepsi Vice President William Glenn Dep. at 360 ("[T]he bottlers didn't sign for a variety of reasons, and that it was our position that, yes, we would, in fact, meet the customers' needs [for open commissary delivery]. And I believe I told Mr. Caudill at our meeting when he asked what we would do, and we said we would have to respond to our customers' needs."). Therefore, it appears that CIC's fears that PepsiCo would provide open commissary delivery to Tricon did have a legitimate basis.

Even if it would not have provided open commissary delivery without CIC's consent, as the Court has stated, PepsiCo has the burden of showing as an issue of fact that CIC acted precipitously when it sent the threat letter to Tricon. The Court, however, finds no evidence in the record regarding the specific mechanics of the waiver process. For instance, at what stage of the negotiations with the National Account Customer would PepsiCo typically contact the local bottler regarding obtaining a waiver? If it were established that that action typically occurred toward the end of the negotiation process, then perhaps it could be said that CIC threatened Tricon prematurely. The record does not show at what stage the negotiations between PepsiCo and Tricon were when CIC sent the threat letter to Tricon. Thus, there is no issue of material fact regarding whether CIC acted prematurely. Because the burden is on PepsiCo to establish that CIC breached the Syrup Appointment, the Court finds that summary judgment in CIC's favor is appropriate on PepsiCo's claim that CIC breached the Syrup Appointment by sending the January 2, 1998 threat letter to Tricon.

■ PepsiCo also points to a February 24, 1998 letter from CIC's counsel to the International Brotherhood of Teamsters Union as more evidence of CIC's interference with its sales to National Account Customers. *See* Doc. No. 219, Ex. I at C021464. The letter warns the Teamsters that PepsiCo's movement towards open commissary delivery was not customer driven, but rather a pretext for diverting profits from local bottlers to PepsiCo. The letter further warns that reduced profits to local bottlers would eliminate union jobs. Although the Court agrees that the letter seeks the Union's help in opposing open commissary delivery, no actual interference with the sales to National Account Customers has been shown. For instance, the letter does not ask the Teamsters to boycott or threaten to boycott deliveries to open commissaries. Rather,

the letter is more along the lines of an information sharing request between two parties trying to ascertain PepsiCo's intentions regarding open commissary delivery. The Court finds, however, no violation of the Syrup Appointment stemming from the sending of this letter.

██ PepsiCo also claims that CIC breached the Syrup Appointment by threatening to intervene in the Pepsi/Coke case. By doing so, Pepsi claims that CIC aligned itself with Coke. Although CIC claims that it proposed to intervene in the case merely to obtain a declaration of its rights, as the Court has noted, if CIC had intervened and proved its contention, i.e., that customers are indifferent toward the method of delivery, then it would have at the same time established a crucial point in Coke's defense of the suit. In ruling on CIC's motion to dismiss, the Court found that this action could have breached the Syrup Appointment if it were shown that CIC acted in a manifestly harmful way. However, as CIC correctly points out, it did not actually intervene in the case and, indeed, Coke won that case without any assistance from CIC. No harm actually came from CIC's threat, thus it is not possible that the threat of intervention by itself was manifestly harmful. It could be, as PepsiCo observes, that the only reason CIC did not intervene in the case was because it filed this lawsuit first. By the same token, it could be that the only reason that PepsiCo did not provide open commissary delivery to the Tricon outlets in CIC's territories was because CIC sent the threat letter to PepsiCo and Tricon. In any event, to the extent that the threat to intervene in the Pepsi/Coke case was a breach or repudiation of the Syrup Appointment, the Court believes that CIC cured its breach by not intervening in the

case and continuing to fulfill its obligations under the Syrup Appointment. *See Liebowitz v. Elsevier Science, Ltd.*, 927 F.Supp. 688, 702 (S.D.N.Y.1996) (continued performance after repudiation of contract is a retraction of the repudiation); *Doyle Dane Bernbach, Inc. v. Avis*, 526 F.Supp. 117, 121 (S.D.N.Y.1981) (same). PepsiCo supports its position with *Riddell Sports, Inc. v. Brooks*, No. 92 CIV 7851(JGK), 1997 WL 148818 (S.D.N.Y. Mar.27, 1997). The facts in *Brooks* are distinguishable, however, because in that case the defendant actually assisted third parties in filing meritless lawsuits against his employer and took other tangible actions which harmed his employer's interests. In this case, however, CIC's threat to intervene never went past the threat stage.[6]

PepsiCo also points to a Sherman Act conviction that the Pepsi–Cola Bottling Company of Fort Lauderdale–Palm Beach, Inc. sustained in 1988 for fixing prices with a local Coca–Cola bottler as evidence of CIC's self-dealing and cooperation with Coke. If PepsiCo did not believe that this conviction was sufficient to terminate CIC's appointments in 1988, it certainly is not enough evidence to terminate them in the year 2001.

██ PepsiCo claims that CIC's actions breached its duty of good faith and fair dealing under the terms of the Syrup Appointment. Under New York law, every contract carries with it an implied duty of good faith and fair dealing. *Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 230 (2d Cir.1991). This means that one party to the contract will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement. *Id.* The covenant of good faith and fair dealing

**6.** Given the Court's conclusions here, it need not explore the parameters of the *Noerr–Pennington* doctrine and whether it immunizes CIC's actions relative to the threat letter to Tricon and the threat to intervene in the Pepsi/Coke case.

is also violated when a party acts in a manner which would deprive the other party of the right to receive the benefits of their agreement. *Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741, 767 (S.D.N.Y.1990). This covenant does not create new rights nor does it impose any obligation which would be inconsistent with the other terms of the contract. *Id.*

 After reviewing the record, the Court finds no evidence that CIC breached its duty of good faith and fair dealing with PepsiCo. In 1963, PepsiCo and CIC entered into an agreement wherein CIC agreed to push vigorously Pepsi syrup within its territories. For a good majority of the intervening years, all delivery of syrup was by store-door delivery. After awhile, PepsiCo and CIC amended their agreement to permit delivery of syrup via closed commissary. PepsiCo has consistently stated to CIC, and others, that open commissary delivery is not permitted under the terms to the agreement. Therefore, PepsiCo has always gotten from CIC what it bargained for—store door delivery of Pepsi syrup except for closed commissaries and those instances in which CIC agreed to waive its rights in favor of open commissary delivery. As CIC points out, PepsiCo has not demonstrated any loss of business due to CIC's insistence on its right to oppose open commissary delivery. Under New York law one party may act in its own best interests under the terms of contract, even if in doing so it incidentally lessens the benefit to the other party. *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co., Inc.,* 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142, 145 (1972). PepsiCo has not even demonstrated an incidental lessening of its benefits under the Syrup Appointment from CIC's alleged wrongdoing. Although PepsiCo claims that it need not show any actual damages to terminate CIC's Syrup Appointment, it still must show a breach of the Appointment and this it has not done.

Accordingly, the Court finds that PepsiCo has not demonstrated that CIC breached its duties of good faith and fair dealing under the Syrup Appointment.

 PepsiCo claims that CIC owed it a fiduciary duty and that CIC breached its fiduciary duty by its actions. As a general rule parties to an arms-length commercial transaction do not have fiduciary duties to one another. *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co., Inc.,* 33 A.D.2d 766, 306 N.Y.S.2d 599, 600 (N.Y.App.Div.1969). A party to a contract does not breach any duties by seeking to enforce its legal and contractual rights. *Creeger Brick & Building Supply, Inc. v. Mid–State Bank & Trust Co.,* 385 Pa.Super. 30, 560 A.2d 151, 154 (1989). On the other hand, under New York law, a distributorship agreement may, in rare instances, create a confidential relationship which gives rise to a duty of care. *Lake Erie Distributors, Inc. v. Martlet Importing Co., Inc.,* 221 A.D.2d 954, 634 N.Y.S.2d 599, 601 (N.Y.App.Div. 1995). A fiduciary relationship is created by the trust reposed by one party in the integrity and fidelity of another, *Beneficial Comm. Corp. v. Murray Glick Datsun, Inc.,* 601 F.Supp. 770, 772 (S.D.N.Y.1985), but may also be found where confidence is based on prior business dealings. *Mellencamp v. Riva Music, Ltd.,* 698 F.Supp. 1154, 1156 (S.D.N.Y.1988). Whether a fiduciary relationship exists between parties to a contract is a question of fact. *See, e.g., Furniture Consultants, Inc. v. Acme Steel Door Corp.,* 240 A.D.2d 180, 658 N.Y.S.2d 284, 285 (N.Y.App.Div.1997) ("The cause of action for breach of fiduciary duty was properly dismissed for failure to adduce facts showing that the parties' relationship was other than arms-length.").

In ruling on CIC's motion to dismiss, the Court suggested that PepsiCo might show that PepsiCo and CIC had a fiduciary rela-

tionship because of their long business relationship and because PepsiCo alleged that it had entrusted CIC with its secret processes and formulas. The parties disagree whether CIC had access to PepsiCo's confidential information. CIC denies that it had access to secret formulas but admits that PepsiCo has disclosed to it certain marketing strategies over the years. PepsiCo contends that its entrustment with CIC of its trademarks and trade names as well as its disclosure of confidential marketing plans created a fiduciary relationship between it and CIC. The Court finds no evidence, however, that CIC actually breached any fiduciary duty relating to the safeguarding of PepsiCo's confidential information and trademarks. Moreover, there is no evidence that CIC held a position of dominance over PepsiCo, a factor which usually accompanies a finding of a fiduciary duty between a franchisor and a franchisee. *See A.S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371, 376–77 (1957); *Lake Erie Dist., Inc. v. Martlet Importing Co., Inc.,* 221 A.D.2d 954, 634 N.Y.S.2d 599, 601 (N.Y.App.Div.1995); *Zimmer–Masiello, Inc. v. Zimmer, Inc.,* 159 A.D.2d 363, 552 N.Y.S.2d 935, 937 (N.Y.App.Div.1990); *see also* William L. Killion, Annotation, *Existence of fiduciary duty between franchisor and franchisee,* 52 A.L.R.5th 613, 1998 WL 1809 (1997).

PepsiCo also claims a fiduciary relationship between the parties by virtue of the 1985 Amendment to the Syrup Appointment, which in part makes CIC PepsiCo's delivery agent for store-door delivery to National Account Customers. *See* Doc. No. 202, Ex. 4 ¶ 10(f). PepsiCo claims that the agency relationship created there makes CIC a fiduciary of PepsiCo. Like CIC, the Court is at a loss to understand how any of the things PepsiCo now complains about caused CIC to breach its fiduciary duty as a delivery agent of PepsiCo. As the Court has consistently stated in this order, the 1985 Amendment does not allow for open commissary delivery and CIC was not appointed as a delivery agent for open commissary delivery. Therefore, any actions CIC took to oppose open commissary delivery could not have breached its fiduciary duty as a store-door delivery agent for PepsiCo.

Finally, PepsiCo claims that CIC breached its duty to "push vigorously" and "secure full distribution" of Pepsi canned and bottled products under the terms of the Bottling Appointment because of its actions vis-à-vis open commissary delivery to National Account Customers. The theory behind this claim is that fountain beverage sales lead to "sampling opportunities" which in turn cause individual purchasers of fountain sodas to buy more canned and bottled products. By its actions in opposition to open commissary delivery, which in theory would lead to increased fountain beverage sales, PepsiCo contends that CIC has lessened the sampling opportunities for Pepsi, which in turn is a breach of its duty to push vigorously Pepsi canned and bottled products. This claim, however, is dependent on a finding that CIC did something wrong by opposing open commissary delivery. As the Court has found, however, CIC committed no breach of the Syrup Appointment. Therefore, the Court finds no breach of the Bottling Appointment.

Accordingly, for the reasons just stated, the Court finds that summary judgment as to each count of PepsiCo's Amended Complaint in favor of CIC is appropriate. Accordingly, CIC's motion for summary judgment is well-taken and is **GRANTED**.

### Conclusion

For the reasons just stated, CIC's motion for summary judgment as to the Counts in PepsiCo's Amended Complaint (Doc. No. 202) is well-taken and is

**1058**

GRANTED. Counts I, II, and III of the Amended Complaint are **DISMISSED WITH PREJUDICE**. ·CIC's motion for partial summary judgment on Count IV of its Counterclaim (Doc. No. 203) is well-taken and is **GRANTED**. In light of these rulings, CIC's motion to file a supplemental memorandum in support of its motion for summary judgment (Doc. No. 238) is **MOOT**.

IT IS SO ORDERED.